YETT v. HOUSTON FARMS DEVELOP-
MENT CO. et al.

No. 9560.

Court of Civil Appeals of Texas. Galveston.
June 24, 1931.

Rehearing Denied July 22, 1931.

Howth, Adams & Hart, of Beaumont, W
T. Williams and W. T. Williams, Jr., both of
Austin, and Ralph Durham, of Beaumont,
for appellant.

Williams, Neethe & Williams, of Galves-
ton, and Vinson, Elkins, Sweeton & Weems,
and Fred R. Switzer, all of Houston, for ap-
pellees.

LANE, J.

This suit was brought by Houston Farms
Development Company, successor in title of
T. Martin's estate, against numerous individ-
uals and against the known and unknown
stockholders of the Turnbow Oil Corporation
and the Turnbow Production Company.

The petition was in the usual form of pe-
titions in suits of trespass to try title. The
purpose of the suit was to try title to certain
described 5,737 acres of land situated in
Galveston county, a part of 36,000 acres for-
merly conveyed by T. W. Davis, independent
executor of the estate of T. Martin, and Aline
Martin, widow of T. Martin, to W. C. Turn-
bow in January, 1919, and which was later
reconveyed by Turnbow and wife to T. W.
Davis, executor, in consideration of the can-
cellation of the unpaid purchase-money notes
and other obligations executed and assumed
by W. C. Turnbow moving his vendors to
convey said lands to him.

After this suit was filed, one Richard Yett
was appointed receiver for the Turnbow Oil
Corporation, and he made answer in the suit
as a defendant and disclaimed as to all in-
terest in the 5,737 acres, except as to seven-
eighths of the minerals, which had been con-
veyed by W. C. Turnbow to the Turnbow Oil
Corporation prior to the reconveyance by
Turnbow to Davis, executor. As to said
seven-eighths of the minerals, such receiver

alleged that the Turnbow Oil Corporation had acquired its title thereto in the following manner:

First. By deed from the executor of the estate of T. Martin and his widow to W. C. Turnbow of date January 2, 1919, by which such parties conveyed to Turnbow the 5,737 acres of land involved in this suit, together with other lands, for a consideration of $537,783.30, payable by the assumption by Turnbow of certain vendor's liens existing against the lands, amounting to about $185,- 000, and the execution by him of eleven vendor's lien notes, aggregating the sum of $325,- 707.

Second. By a deed from W. C. Turnbow to Turnbow Oil Corporation of date January 27, 1920, whereby the said seven-eighths of the minerals upon and under the land was conveyed to the Turnbow Oil Corporation, it being expressly stated in such deed that one-eighth of such minerals was reserved to the grantee.

Pleading further, the receiver alleged:

That "on the 14th day of March, 1922, W. C. Turnbow, being unable to meet his obligations to the Martin Estate and unable to pay the notes representing the balance of the purchase price of the said land, entered into an agreement with the representatives of the Martin Estate to reconvey the lands by quitclaim deed, conditioned upon the cancellation and surrender of the remaining unpaid vendor's lien notes executed by W. C. Turnbow to the estate, and this agreement was carried into effect by W. C. Turnbow and wife conveying, on the 14th day of March, 1922, to the executor of the Martin Estate, the lands and premises covered by the deed from said estate to Turnbow above described, and in this deed of reconveyance it is expressly stated that the consideration was the cancellation and surrender of the remaining unpaid vendor's lien notes executed by W. C. Turnbow to T. W. Davis, executor of the Martin Estate, and described in the deed to W. C. Turnbow from T. W. Davis, executor, dated January 2, 1919, and further expressly describing the notes and also expressly stating a further consideration of the cancellation of all indebtedness due by W. C. Turnbow to T. W. Davis, executor of the estate under certain other instruments.

"That the legal effect of this agreement and reconveyance in pursuance thereof was that W. C. Turnbow and wife conveyed only the interest they then had in the said lands, to-wit, the surface and one-eighth of the minerals, and that by such agreement the title and possession of the Turnbow Oil Corporation to seven-eighths of the minerals under said lands were released and freed of all liens and claims against said minerals by the Martin Estate.

"That the legal effect of the agreement between the Martin Estate and Turnbow for his reconveyance was an election on the part of the estate to rescind the original sale to W. C. Turnbow by the Martin Estate receiving back whatever right, title and interest Turnbow and his wife had at that time, to-wit, the surface and one-eighth of the minerals, the consideration to Turnbow being that his remaining indebtedness to the estate should be cancelled, and that the Martin Estate was bound by its election to rescind and was estopped to assert any right or title in the seven-eighths of the minerals conveyed by Turnbow to Turnbow Oil Corporation.

"That the reasonable market value of the interest in the said lands remaining in Turnbow at the time of his reconveyance as above stated, to-wit, the reasonable market value of the surface and one-eighth of the minerals, was at least equal to, if not greater than, the balance of the indebtedness then owed by Turnbow to the Martin Estate.

"That at the time of the agreement aforesaid between the Martin Estate and Turnbow and at the time of his reconveyance in pursuance of said agreement, or at about said time, W. C. Turnbow, without any authority whatsoever, undertook to reconvey by joint deed from Turnbow Oil Company and Turnbow Production Company, through himself as president of each company, by quit-claim deed, all of the right, title and interest of the two corporations to the said lands, that is, purporting to convey seven-eighths of the minerals that had been theretofore conveyed by W. C. Turnbow to Turnbow Oil Corporation, which said corporation had, in the meantime, conveyed seven-eighths of the minerals under certain definite portions of said lands to the Turnbow Production Company; that the said joint deed from the two corporations was void and of no legal effect to convey any title out of the said corporations, because same was without any authority whatsoever from the respective officers or stockholders of said corporation, but that the purported conveyance was for the sole benefit of W. C. Turnbow, purporting to act as the president of each company, and for the purpose of cancelling his personal indebtedness to the Martin Estate and others; and that thereby the Martin Estate having agreed to cancel Turnbow's indebtedness in consideration that he reconvey what title and interest he personally had in said lands at said time, was estopped to claim any right or title under the purported joint deed from the Turnbow Oil Corporation and the Turnbow Production Company.

"That, premises considered, it was the duty of the Martin Estate to notify the defendant, Turnbow Oil Corporation, either that they elected to rescind the contract and take back the property or that they would file suit for the balance due and foreclose the vendor's liens, if the estate was claiming the title to the mineral interest conveyed by Turnbow to

the Turnbow Oil Corporation, but that it had failed to make any such claim or give any such notice to the proper officers, agents or stockholders of the said corporation, and that in the circumstances it was the duty of the Martin Estate to file suit for foreclosure, making W. C. Turnbow and the two corporations defendants in order that the rights and interests of the corporations should be duly protected, because equities had intervened, in that the Turnbow Oil Corporation paid a valuable consideration for seven-eighths of the minerals and the said W. C. Turnbow had paid substantially half of the purchase price for said land and had made permanent improvements thereon of the value of approximately One Hundred Thousand ($100,000.00) Dollars, and that the reasonable market value of what Turnbow himself reconveyed to the Martin Estate was at least equal to the amount he still owed the estate on the purchase price; and that, therefore, the Martin Estate could not arbitrarily rescind its contract of sale to W. C. Turnbow, at least could not rescind such sale with respect to the interest that had been conveyed by Turnbow to the Turnbow Oil Corporation, but was in a position to rescind, if at all, only by agreement with W. C. Turnbow with respect to his reconveying the interest he then had.

"That the Martin Estate was further estopped to assert any right or title under the purported deed from Turnbow Oil Corporation, because monies belonging to said corporation were used by W. C. Turnbow to pay off part of Turnbow's indebtedness to the Martin Estate, and that the officers and agents of said estate accepted the said money knowing that it was paid by W. C. Turnbow with and out of the funds belonging to the Turnbow Oil Corporation; and that the Martin Estate frequently granted extensions of time within which the said vendor's lien notes should be paid, and thereby waived their rights to strict performance of payments of said vendor's lien notes according to their tenor.

"That plaintiff and the Martin Estate were estopped to assert any claim to seven-eighths of the minerals conveyed to the Turnbow Oil Corporation, because at the time of the agreement between the Martin Estate and W. C. Turnbow for his reconveyance as aforesaid, the deed from Turnbow to Turnbow Oil Corporation was duly recorded and the officers and agents of the Martin Estate had actual and constructive knowledge at the time of said reconveyance from Turnbow to the Martin Estate that Turnbow Oil Corporation owned seven-eighths of the minerals by virtue of the warranty deed from W. C. Turnbow, and that the legal effect of the agreement with Turnbow for his reconveyance was that if Turnbow would reconvey what interest he then had, to-wit, the surface and one-eighth of the minerals, the Martin Estate would can-

cel all of his vendor's lien notes and other indebtedness remaining of the purchase price.

"That the said Turnbow Oil Corporation was a sub-vendee for valuable consideration paid by it to W. C. Turnbow for seven-eighths of the minerals under all of said lands, and that neither the plaintiff, Houston Farms Development Company, nor its predecessor in title, the owners of the Martin Estate, ever made demand or claim, or gave notice to the said Turnbow Oil Corporation that they or any of them were demanding payment from the said corporation of the said amounts, or any part thereof, as evidenced by the said vendor's lien notes executed by W. C. Turnbow, or by the said T. Martin and never instituted suit for the foreclosure of any of said notes, but, on the contrary, without notice to the Turnbow Oil Corporation or its officers or stockholders, the owners of the Martin Estate, made and entered into a valid and binding contract with W. C. Turnbow whereby for and in consideration of the reconveyance to them of all of said properties, except the seven-eighths of the minerals and the surface rights, they agreed to cancel and did cancel all the said vendor's lien notes, and that the legal and equitable result thereof was that they further agreed and obligated themselves to cancel and waive and did thereby cancel and waive their superior title, if any, insofar as the seven-eighths of the minerals conveyed to Turnbow Oil Corporation was affected, and thereby plaintiff is estopped to claim the seven-eighths of the minerals, or any part thereof, that was conveyed to Turnbow Oil Corporation.

"That the purported joint deed from Turnbow Oil Corporation and the Turnbow Production Company to the Martin Estate was void and ineffectual to convey any interest and inadmissible as evidence for any purpose, because the officers purporting to execute it in behalf of the companies were without authority, that there was no resolution of the board of directors, that there was no valuable or other consideration therefor received by the corporations, but that the said deed was in fraud of the rights of both of said corporations and their directors and stockholders, for that, the said corporations received no benefit therefrom, but that the said deed was executed for the exclusive benefit of W. C. Turnbow, assuming to be the president of each of said corporations at said time.

"That neither the Martin Estate nor the plaintiff herein ever had the superior title to the said lands, for that, at the time the land was purchased by Martin, he owed large amounts as part of the purchase price, secured by vendor's lien notes, the superior title being then in his grantor or grantors, who upon the payment of said indebtedness by W. C. Turnbow executed releases directly

to the said Turnbow and thereby conveyed to him the superior title.

"That on or about the first day of October, 1920, sometime after the conveyance by T. Martin to W. C. Turnbow and the conveyance by Turnbow to the Turnbow Oil Corporation of seven-eighths of the minerals as heretofore stated, W. C. Turnbow and wife executed a deed of trust to L. J. Albert, trustee for the International Life Insurance Company, covering all of said lands, to secure the payment to the said International Life Insurance Company of the sum of One Hundred Seventy Five Thousand ($175,000.00) Dollars, same being a loan by the said insurance company to W. C. Turnbow. Thereafter, on or about the 23rd day of December, 1920, the executor of the estate of T. Martin, deceased, in behalf of the beneficiaries of the Martin Estate, entered into and executed a subordination agreement, whereby the Martin Estate agreed to cancel the existing vendor's liens in its favor against W. C. Turnbow for the payment of the balance of the purchase price still due, whereby T. W. Davis, independent executor of the estate of T. Martin, deceased, in consideration of the benefit to be derived by the said estate because of the making of the loan by the said insurance company to the said W. C. Turnbow, expressly made and constituted the said notes and deed of trust in favor of the said International Life Insurance Company the first and prior lien on the real estate described in said deed of trust, and expressly agreed that the notes and liens due to the Martin Estate should be a second and inferior lien on said premises and subordinate to the lien held by the International Life Insurance Company; and that the legal effect of the said subordination agreement was to place the superior title to all of the said thirty seven thousand acres of land in W. C. Turnbow, and the further legal effect thereof was that by virtue of Turnbow's warranty deed to Turnbow Oil Corporation to seven-eighths of the minerals thereunder, the superior title to seven-eighths of the minerals thus automatically vested in the Turnbow Oil Corporation."

The cause was submitted to the court without a jury, and judgment was rendered by the court, upon the evidence, for the plaintiff Houston Farms Development Company, and against all of the defendants, for the title to the land involved in the suit, including all the minerals thereon and thereunder.

Richard Yett, receiver, acting as such receiver in the interest of the defendant corporation and in the interest of the stockholders of such corporation, alone has appealed.

As already stated, T. W. Davis, independent executor of the estate of T. Martin, and Aline Martin, widow of T. Martin, by their general warranty deed of date January 2, 1919, conveyed approximately 36,000 acres of land, including the 5,737 acres involved in this suit, to W. C. Turnbow for a consideration of $537,783; such consideration was to be paid by Turnbow's assuming the obligation to pay the sum of about $185,000 due by the estate of T. Martin as a part of the purchase price of said lands and which was secured by a vendor's lien on same, and by the execution and delivery by Turnbow of his eleven vendor's lien notes to his vendors for the balance of the purchase money, seven of which were for the sum of $25,000 each, three for $50,000 each, and the other for $25,707. The payment of all of said notes was also secured by a deed of trust executed by Turnbow on the day the notes were executed, conferring upon the trustee power of sale in the event of default in the payment of any of the notes, taxes, etc., when due.

On the 27th day of January, 1920, W. C. Turnbow and wife by their deed conveyed to Turnbow Oil Corporation seven-eighths of the minerals upon and under the 36,000 acres conveyed to Turnbow by the Martin estate.

On October 1, 1920, Turnbow, for the purpose of obtaining money with which to pay off the original vendor's lien notes, which he had obligated himself to pay, borrowed $175,000 from International Life Insurance Company, and to secure the repayment of such sum he and his wife, on the 1st day of October, 1920, executed and delivered to said company a deed of trust upon the 36,000 acres of land.

On December 23, 1920, T. W. Davis, executor of the estate of Martin, deceased, executed a subordination agreement, reciting that the $175,000 borrowed by Turnbow from said life insurance company was to be used in the payment of the original vendor's liens owing by the estate of Martin to the vendor's of Martin which Turnbow had assumed, such agreement reciting that the liens of the Martin estate upon the land by virtue of the vendor's lien notes executed by Turnbow were subordinated to the lien of the life insurance company. Such loan from the insurance company, together with $10,000 advanced by the Turnbow Oil Corporation, was applied to the payment of the original indebtedness owing by the Martin estate to Martin's vendors, which Turnbow had assumed as a part of the consideration passing from him to Martin in payment for the 36,000 acres conveyed to him by Davis, executor, and Aline Martin.

W. C. Turnbow paid five of the $25,000 notes given by him to the Martin estate, aggregating $125,000. He had also made improvements on the 36,000 acres estimated to be of the value of $72,000.

On the 14th day of March, 1922, a large part of the notes given by Turnbow as part consideration for the land was past due and unpaid, and the taxes due on the land for three years, amounting to a large sum, which Turnbow had agreed to pay, were also unpaid.

Such being the conditions confronting the executor of Martin's estate, such executor was pressing Turnbow for payment, and threatening to have the land sold under the provision of the deed of trust given to secure payment of Turnbow's obligations. Turnbow, being without means to pay such indebtedness and being pressed for payment, did, as a last resort, on said 14th day of March, 1922, reconvey all of the 36,000 acres of land, including the minerals, to the Martin estate. Such conveyance recites that it conveyed all of the land, as follows:

"All those lots, tracts and parcels of land lying and being situated in the Counties of Brazoria and Galveston, State of Texas, heretofore conveyed to W. C. Turnbow by T. W. Davis, Independent Executor under the will and of the estate of T. Martin, deceased, and Aline Martin.

It being the intention of the grantors herein to reconvey to the said T. W. Davis, Independent Executor under the will and of the estate of T. Martin, deceased, all of the land which was conveyed to the said W. C. Turnbow by the deed above referred to, as well as any and all other deeds from the estate of T. Martin, deceased, and Aline Martin, under which the said W. C. Turnbow now claims, or has ever claimed, title to the said land, or any part thereof."

It also recites that several of the notes executed by him, aggregating the sum of $225,707, were unpaid, and further reciting as follows:

"It is understood that the remaining notes (meaning the unpaid notes) described in the deed above referred to have been paid off and discharged, and the grantee, by the acceptance hereof, acknowledges the payment of said notes. * * *

"It is further understood and agreed that as a part of the consideration for this conveyance, the indebtedness assumed or agreed to be paid by W. C. Turnbow, which was originally the indebtedness of T. Martin of the Martin estate, is hereby cancelled and terminated."

In connection with the deed it was proven that for several months prior to the execution thereof there had been negotiations between J. A. Elkins, representing T. W. Davis, independent executor of the estate of T. Martin, on the one hand, and W. C. Turnbow, who was the president of the Turnbow Oil Corporation, and J. E. Price, retained counsel thereof, on the other hand, with reference to the payment of said notes held by the Martin estate, $100,000 of which were past due according to their due date.

J. A. Elkins testified:

"In the early part of 1921 I commenced talking to Mr. Turnbow and Mr. Price with reference to the notes that Mr. Turnbow had executed to the Martin estate, and secured by a deed of trust and vendor's lien on the properties involved in this suit. Some of those notes and taxes were then past due. At that time Mr. Price was representing Mr. Turnbow and the Turnbow companies. As to the result of my conversation at that time with Mr. Turnbow with reference to the taxes and the notes that were due on the property, well, I could not collect, could not get the taxes paid. I talked the matter over a number of times with Mr. Turnbow; I could not give you the definite number. Shortly before the date of the deed of reconveyance of March 14, 1922, signed by Mr. Turnbow and his wife, I, with Mr. T. W. Davis, executor of the estate, had several conferences with Mr. Turnbow, and one in Mr. Price's office. I know we went down there. At the date of the reconveyance on March 14, 1922, I don't know how many of these notes that Mr. Turnbow and his wife had executed to T. W. Davis, Executor, were unpaid. The deed will show that. I think it recites the facts. It was my recollection that five of them had been paid of $25,000.00. As to the number of notes executed, well, he assumed the payment—that is correct that the instruments will speak for themselves. To my recollection, five of them had been paid. The rest of them, principal and interest, had not been paid. The last conversation that Mr. Davis and I had with Mr. Turnbow and Mr. Price before the execution of this deed of March 14, 1922, was a few days before, maybe a week or ten days, maybe longer; something like that. We went to Mr. Turnbow's or Mr. Price's office, one of the two. They had their offices in the same building. That was known as the Turnbow Building at that time. That is where Mr. Turnbow had his companies. Well, it was agreed to do that, rescind the trade and give back Mr. Turnbow his indebtedness, and take the land back he had heretofore conveyed to Mr. Turnbow, and clear the transaction. That same agreement had been made before, however; the same understanding between the same parties. Mr. Turnbow never tried to avoid doing that. He acted all right about it. He was hoping something would happen, and I was hoping just the same as he was. It was subsequent to that that this deed of March 14, 1922, was executed and that the deed counsel have asked about, signed by Mr. Turnbow on behalf of the two corporations, was executed.

"At that time in his conversations with me when I was talking about the notes due the Martin estate represented by Mr. Davis, Mr. Turnbow said he couldn't pay. There was no denial of that. He had not paid the taxes in 1920, 1921, or 1922. The only thing he said was that he wasn't able to pay them, and hadn't paid them. The taxes for those years were paid afterwards.

"I knew absolutely nothing about the affairs of the Turnbow Oil Corporation or Turnbow Production Company in March, 1922. I did

**310**

not know anything about the internal affairs. I do not recall that there was any statement made by Mr. Turnbow at that time in reference to the condition of those companies."

In the same connection J. E. Price testified:

"My name is J. E. Price. I am a practicing lawyer in the City of Houston, Texas, and am the same person whose deposition was taken in this case by Mr. Hart and attorneys for the Receiver. My deposition was taken in this case at Houston some time ago.

"During the year 1922 I was attorney for the Turnbow Oil Corporation and the Turnbow Production Company. They had their offices in the Turnbow Building, in Houston, Texas, and I also had my office in that building. I was retained by the Turnbow Oil Corporation, and the Turnbow Production Company was a sort of outgrowth or branch of the Turnbow Oil Corporation, and I was attorney for it also. I was attorney for those two companies practically from their inception up to the time Mr. Turnbow ceased being the dominant officer of them. * * *

"I had my attention called a great many times, principally by Judge Elkins and Mr. Wood from his firm, to the fact that there was money unpaid on notes held by the Martin estate on the 36,000 acres of land, a part of which is involved in this suit. The situation became acute. Prior to March, 1922, I remember having a number of conversations about it with Judge Elkins and Mr. Turnbow. Judge Elkins at one time came to the office and brought some gentleman with him. I did not remember who it was; don't remember now. I heard Judge Elkins tell this morning who it was. I remember now it was Mr. Davis who was representing the Martin estate. In the conversation between those gentlemen and Mr. Turnbow and myself they said they could not carry the notes past due any more and this matter had to be arranged at once. Something had to be done about it. There was talk about the reconveyance. I am not sure about that reconveyance being mentioned at the conference held at that time. It probably was. I would not say for sure. It was mentioned to me a number of times, and Judge Elkins wrote me a letter about it at one time, and then Judge Elkins called me on the phone and asked me to state to Mr. Turnbow that this money which was due the Martin estate must be paid or the reconveyance made as had been agreed upon, or he would have to bring foreclosure proceedings and that he could not wait any longer. That was the last conversation I had with Judge Elkins about the matter. At that time Mr. Turnbow was out of town. He came in in a few days, and when he did come in I told him what had taken place and he said: 'Well, I might just as well go on up and make arrangements with Judge Elkins about conveying the property back because it looks as

though I can't make the hill and get any money on this to save it,' and we talked the matter over at the time and Mr. Turnbow said he was going on up there.

"As to the period of time that the conversations between me, representing my clients, and Judge Elkins, representing his clients, and Mr. Turnbow covered before the final conversation with Mr. Turnbow about it, I would say that the first time that this thing began to get acute was back in December prior to it being finally closed up in March."

With reference to the financial condition of the Turnbow Oil Corporation during the latter part of the year 1921 and the first of 1922, J. E. Price testified:

"My recollection is that it was in July or August of 1922 that Mr. Turnbow ceased to be president of those two companies. It was in the summer; I think it was July. At the time he ceased to be president of them they had no money. As to their assets, well, at that time they had some, what we call, wildcat leases that had not been forfeited, I believe—perhaps very few. As to whether they had a good many leases at the time, Turnbow Oil Corporation did have, and transferred a few of them to the Turnbow Production Company. Nearly all of those leases, and perhaps all of them—I wouldn't say for sure—had been forfeited by either failure to pay rentals or by expiration or failure to drill or explore.

"I think probably I was a director in May, 1921. I wouldn't say for sure that I was a director then. I resigned about the time— well, there was 5 or 6 of us resigned at the same time. Well, the only reason for our resigning was that Mr. Grosslicht, who had the contract which is in evidence here as the organization contract, had failed to raise the money for the corporation that he had agreed and thought he could raise in the East, and the whole plan of the thing fell through. * * * As to whether all of the directors resigned merely because Mr. Grosslicht did not sell some stock and send the money down here, they resigned because he did not carry out his contract as he said. I did not say it was because he did not send the money; it was because he did not carry out his contract to raise the money."

On the same issue Turnbow testified:

"As to what led up to or caused me to make the reconveyance back by an instrument executed by me and my wife to the Martin estate * * * well, the notes come due and I did not have the money to pay them at that time.

"It is true that at the time I and my wife made this reconveyance back to the Martin estate I owed, according to the record, approximately $398,000.00 as part of the purchase price of that ranch.

"At the time I made this reconveyance, that was all of the property that Turnbow Oil Corporation had then.

"It was subject to an indebtedness of between $350,000.00 and $400,000.00. That is right, that neither I nor the corporation had the money to pay it and haven't had it since."

At the time Turnbow reconveyed the land to Martin's estate, a large sum due for taxes for the years 1921 and 1922 were unpaid, and there was due and·unpaid on the vendor's lien notes executed by Turnbow the principal sum of $225,707 and interest due thereon in the sum of $27,848.84, aggregating ·$252,791.84, and no part of the $175,000 due the insurance company had been paid, which sums, exclusive of the sum due for taxes, amount to $427,791.84.

After the land was reconveyed to the Martin estate, the title thereto passed to the appellee Houston Farms Development Company by a regular chain of conveyances from Martin's estate.

Upon request therefor, the court filed its findings of facts and law, wherein the facts already stated by us were substantially stated as facts, and other facts pertinent to the issues involved found by the court are substantially as follows:

That it was known to the oil company at the time it took its deed to a part of the minerals from Turnbow that the land had not been paid for and that it was subject to the purchase-money liens and the taxes due thereon; that· the $175,000 borrowed from the life insurance company was not delivered to Turnbow; that he handled no part of same; that negotiations for such loan were handled by J. A. Elkins, attorney for Martin's estate; that at the time the Turnbow Oil Company advanced the $10,000 to Turnbow, such company was indebted to Turnbow.

The court found further as follows:

"For several months prior to said 14th day of March, 1922, T. W. Davis, Independent Executor of the Martin estate, and J. A. Elkins, attorney for said estate, had been constantly, repeatedly and urgently demanding of Turnbow that he pay the notes in question as well as the taxes. Turnbow testified in this cause, admitting the urgent and repeated demands made upon him by the Martin estate for payment of the notes and taxes in question, and also testified that at said time, and for a long time thereafter, he was utterly unable, financially, to pay said notes or taxes, or any part thereof. He also testified that the Turnbow Oil Corporation· and Turnbow Production Company, Inc., at said time, and ever since said time, has had no money whatsoever or credit with which to pay said notes or taxes, or any part thereof. This testimony was uncontradicted, and I find same to be true in fact.

"J. E. Price, Esq., testified in this cause that on and prior to the 14th day of March, 1922, he was a director of the Turnbow Oil Corporation and was its general counsel as well as counsel for W. C. Turnbow individually; that his office, the office of the Turnbow Oil Corporation and the Turnbow Production Company, Inc., and the office of W. C. Turnbow were all located together in the Turnbow Building in the City of Houston, Texas; that from about the middle of December, 1921, until March 14, 1922, he personally engaged in the conversations between Elkins, Davis and Turnbow relative to Turnbow's default on the notes aforesaid. He also corroborated Mr. Turnbow to the effect that the Turnbow Oil Corporation and the Turnbow Production Co., Inc., had no money or credit at that time. This testimony was uncontradicted, and I find same to be true in fact."

Again: "I further find that the said W. C. Turnbow individually and as the then president of the Turnbow Oil Corporation and the Turnbow Production Company, Inc., and as the designated agent in Texas of the said Turnbow Oil Corporation as shown by its permit to do business in Texas, and the said J. E. Price, the then general counsel of the Turnbow Oil Corporation and the Turnbow Production Company, Inc., and a member of the board of directors of said corporation, were informed on said 14th day of March, 1922, and well knew on said date that the representatives of the Martin estate had elected to rescind their contract with the said W. C. Turnbow to convey the land in question and had, as of that date, determined to and had repossessed the land and estate in question, 'together with all and singular the rights and appurtenances thereto,' including the entire mineral estate, and that the said W. C. Turnbow, individually and in his representative capacity aforesaid, and the said J. E. Price in his representative capacity aforesaid, made no protest or objection whatsoever against the aforesaid election and action by the Martin estate. I further find that no effort whatsoever was made by the said W. C. Turnbow or the Turnbow Oil Corporation or the Turnbow Production Company to make good Turnbow's contract with the Martin estate for the payment of the land, either in whole or in part."

Again: "I find that neither the notes, nor any part thereof, described in Turnbow's deed of reconveyance aforesaid as being unpaid, as well as the indebtedness originally owing by the Martin estate and assumed by Turnbow, or any part thereof, referred to in said deed of reconveyance, has ever been paid by the said W. C. Turnbow, the Turnbow Oil Corporation, or the Turnbow Production Company, Inc., or any person in his or their behalf; and I also find that from and since the said 14th day of March, 1922, the Martin estate has never made any demand or request of the said

W. C. Turnbow, the Turnbow Oil Corporation or the Turnbow Production Company, Inc., to pay said notes and indebtedness, or any part thereof, but have since the said 14th day of March, 1922, consistently regarded said notes and said indebtedness as cancelled insofar as the said W. C. Turnbow, the Turnbow Oil Corporation or the Turnbow Production Company, Inc., or any person holding or claiming under them is concerned."

Again: "I find and conclude as a matter of law and fact that the execution and delivery of the instrument aforesaid was notice and knowledge to the Turnbow Oil Corporation and the Turnbow Production Company, Inc., of the fact that the Martin estate had elected, as of March 14, 1922, to rescind its contract to convey the land in question to Turnbow and of its act of repossessing, as of that date, the land in question."

Again: "I find that no minerals of any kind have ever been discovered under the land in question, and that so far as evidence in this case is concerned no geologist or other learned person has ever expressed the opinion that minerals do underlie said land. I further find that no minerals have ever been discovered sufficiently close to said land to give rise to the reasonable belief that minerals do underlie said land. * * *

"That on the 14th day of March, 1922, Turnbow owed the Martin estate in excess of $400,000.00 on the purchase price of said land. I further find from the evidence in this case that neither on the 14th day of March, 1922, nor at any time since that date, has the land, together with all and singular the rights and appurtenances thereto in anywise belonging, including the entire mineral estate and including all improvements placed thereon by the said W. C. Turnbow, had a reasonable market value of as much as $400,000.00, and that never from the 14th day of March, 1922, could said land, together with the entire mineral estate and the improvements placed thereon by the said W. C. Turnbow, have been sold for as much as $400,000.00, and that therefore the Martin estate did not gain an advantage by repossessing the land from the said W. C. Turnbow, as hereinabove repeatedly referred to, but, on the contrary, lost in the neighborhood of $25,000.00 by Turnbow's failure to carry out his contract to purchase of January 2, 1919." .

#### Conclusions of Law.

"I therefore conclude as a matter of law that the plaintiff, the Houston Farms Development Company, should recover in this action all of the land in question, together with all and singular the rights and appurtenances thereto in anywise belonging, including the entire mineral estate, and that it should be in all things quieted in its title thereto."

The findings of the court are amply supported by the evidence. It appears that on the 2d day of January, 1919, the executor of the estate of T. Martin, joined by Martin's widow, conveyed to W. C. Turnbow 36,000 acres of land for a consideration of $537,783.-30, to be paid as follows: $325,707 by notes executed by Turnbow, and the assumption of an indebtedness owing by the estate of Martin to Martin's vendors, the payment of which was secured by a lien on the land; that on the 27th day of January, 1920, at a time when the above-mentioned obligations of W. C. Turnbow were unpaid and unperformed, Turnbow executed and delivered to Turnbow Oil Corporation, of which he was president and designated Texas agent, a deed to seven-eighths of the minerals upon and under the 36,000 acres of land; that thereafter, in March, 1922, Turnbow finding himself and the oil company unable to discharge the obligations assumed by Turnbow as consideration for the land, and being pressed for payment by the executor of the Martin estate, reconveyed the land together with minerals upon and under the same to the Martin estate in satisfaction of the obligations assumed and contracted by him as the consideration for his deed to the land.

Under the facts stated, appellant contends that since Turnbow had, by his deed of January, 1920, conveyed seven-eighths of the minerals to the oil corporation he owned only the surface of the land and a one-eighth of the minerals on or under it in March, 1922, at which time he made the reconveyance to the Martin estate, and therefore the reconveyance deed conveyed only one-eighth of the minerals, leaving the title to the seven-eighths thereof in the oil corporation. Appellant further contends that under the facts stated the oil corporation had an equity in the seven-eighths of the minerals of which it was not and could not be deprived by said reconveyance deed. Wherefore, the court erred in rendering judgment for appellee for the whole of the minerals upon and under the land.

■ We overrule appellant's contention. At the time the oil corporation accepted Turnbow's deed, it had both actual and constructive notice of the deed from Davis, executor, and Mrs. Aline Martin, by which they conveyed the land to Turnbow, and of its contents. It also knew that Turnbow had paid comparatively but a small part of the consideration moving his vendors to deed to him the land.

It was known by the oil corporation at the time W. C. Turnbow sought by his deed to convey to Turnbow Oil Corporation seven-eighths of the minerals, that the land was subject to an indebtedness of $427,791, and in addition thereto the penalty of 10 per cent. upon such indebtedness, as provided in the notes which Turnbow had obligated himself to pay, which two items and the unpaid tax-

es amounted to a sum largely in excess of the value of the entire 36,000 acres of land.

■■ A vendor of land retaining a vendor's lien which the vendee fails to discharge has a right to resume the title to the property, even though the vendee has paid part of the purchase money and made improvements. In such case, the only remedy the vendee has to prevent such resumption is to tender to his vendor the unpaid purchase money and a performance of such other obligations assumed by him as a part of the consideration for the property. Browning v. Estes, 3 Tex. 462, 49 Am. Dec. 760; Estes v. Browning, 11 Tex. 237, 60 Am. Dec. 238; Moore v. Giesecke, 76 Tex. 543, 13 S. W. 290; Herman v. Gieseke (Tex. Civ. App.) 33 S. W. 1006, 1007; Hollis v. Smith, 64 Tex. 280.

The evidence shows no tender of the unpaid purchase money, or any part thereof by any one, or at any time, nor is there the slightest intimation in the entire record that any such tender was made, contemplated, or could have been made by the oil corporation to the Martin estate. The evidence shows that at the time Turnbow reconveyed the land to the Martin estate the Turnbow Oil Corporation's entire capital consisted of its claim to the seven-eighths of the minerals involved in this suit; that it had no money at such time; and that it was dissolved and ceased to transact business a short time thereafter. Under such circumstances, the oil corporation could not have successfully asserted an equity in the land, or the minerals, had a suit for rescission been brought by the Martin estate against W. C. Turnbow, as it is here contended it had the right to do, and which right it is here contended was defeated by the reconveyance of W. C. Turnbow to the Martin estate.

The executor of the Martin estate, the vendor of W. C. Turnbow who retained a vendor's lien, upon default in the payment of the purchase money and performance of other obligations assumed by the vendee as considerations for the purchase, had a right to rescind the executory contract of sale and resume the title as against the oil corporation, subvendee of W. C. Turnbow, who had notice of the superior title so reserved at the time it accepted its deed from Turnbow to a part of the minerals upon and under the land.

The case of Hollis v. Smith, 64 Tex. 280, was one in which it appears that one Sublett, pursuant to the act of 1874, entered into a contract with the state for the purchase of certain land under deferred payments. Prior to the satisfaction of the deferred payments by Sublett, one Hollis purchased the land from Sublett. Either Sublett or Hollis, while the land was in their possession, placed valuable improvements thereon. In 1880 the state recovered judgment against Sublett for the land on account of his failure to pay the purchase money when due. Subsequently the land was granted to one Smith, who filed suit against Hollis, subvendee under Sublett. Hollis sought to prove valuable improvements. Our Supreme Court, in deciding the case, said:

"Can one purchasing land which he knows to be held by such a tenure suppose himself to be the true owner? Can he be ignorant that the superior title is in another, and that this can be obtained only by a compliance with a contract purely executory, and that upon failure to comply a forfeiture will occur?

"Does not a person so purchasing assume the risk of failure in his vendor to make the requisite payments, and might he not protect himself by making the payments? Can such a purchaser have other or greater right than had his vendor?

"It is certainly true that neither Sublett, nor any one claiming under him, upon his failure to pay the purchase money, could have asserted as against the state a claim for improvements made before the declaration of forfeiture or at any other time, and it would be strange indeed if such a claim could be asserted against one holding directly from the state through title accruing subsequently to the declaration of a forfeiture, made for the very reason that the person making the improvement, or those under whom such person claims, have failed to pay for the land."

■ The rescission of the contract by which the Martin estate sold to W. C. Turnbow is binding upon the Turnbow Oil Corporation, a subvendee of Turnbow, who bought with notice of the liens of the Martin estate. Thompson v. Robinson, 93 Tex. 165, 54 S. W. 243, 77 Am. St. Rep. 843; Scott & Carmody v. Canon (Tex. Com. App.) 240 S. W. 304; Rooney v. Porch (Tex. Com. App.) 239 S. W. 910; Thompson v. Westbrook, 56 Tex. 265; Underwood v. Hogg (Tex. Civ. App.) 261 S. W. 556; Johnson v. Smith, 115 Tex. 193, 280 S. W. 158.

■ The acceptance of the deed of conveyance by the Martin estate did not create a new title in such estate. Dennis v. McEntire Mercantile Co., 187 Ala. 314, 65 So. 774.

The case of Dennis v. McEntire Mercantile Co., supra, is one in which one Barron, the owner of certain land on the 23d day of December, 1905, gave one Dennis a mortgage upon his land, and on May 5, 1906, he gave the mercantile company a mortgage on the same land. On December 3, 1907, Barron deeded the land to Dennis in satisfaction of his debt and mortgage. On December 24, 1908, the mercantile company took a deed from Barron for the land in satisfaction of its debt and mortgage. Dennis sued for title to the land, and the mercantile company defended on the theory that Dennis at the time he accepted his deed in satisfaction of his debt and mortgage

had notice of its mortgage, and that such facts established the priority of the mercantile company's mortgage. In that case the Supreme Court of Alabama said: "In the case before us the debt due complainant was satisfied by a deed taken in lieu of formal foreclosure, not otherwise. The deed operated as a satisfaction and extinguishment of the debt secured by the mortgage; but its effect upon complainant's interest in the land was, not to destroy the legal title vested in him by the mortgage and defendant's default, nor to create a new and independent title by way of substitution, but simply to vest in complainant defendant's equity of redemption and strip the latter of all his remaining interest in the land, thus uniting in complainant the titles of mortgagor and mortgagee as in a stranger purchasing at a foreclosure sale."

On principle, we cannot conceive that the oil corporation, a subvendee, can have any better right than Turnbow, the original vendee, because the resumption by the vendor of the title for a failure of the vendee to pay the purchase money is in no wise dependent upon the acquiescence or consent of the vendee, or those claiming under him, who are charged with notice of the rights of the original vendor to a rescission of the executory contract of sale upon default being made by his vendee in the payment of the purchase money.

Turnbow, on the day he received his deed from his vendors, executed a deed of trust by the terms of which he expressly empowered J. A. Elkins, trustee, in case default should be made in payment of the purchase-money notes, or any of them, or any installment of interest due thereon, when the same should become due, to sell the entire property conveyed to him at public sale and to apply the proceeds to the payment of the purchase money notes, etc.

■ There can be no doubt, in the opinion of the writer, that such a sale could have been legally made without notice to the oil corporation, the subvendee, and that the purchaser at such sale would get title to the land, including the minerals, unincumbered by the claim of such vendee to seven-eighths of such minerals. Can it therefore be reasonably thought that a rescission of the executory contract of sale to Turnbow could not in toto be had by agreement of the vendor and vendee to accomplish the same purpose? Is the law such as would under the circumstances require the incurment of large expenses by a sale of the land by the trustee which would bring about the same results as did occur by the agreed rescission? The writer does not so construe the law.

■ The Turnbow Oil Corporation was not an innocent purchaser for value, without notice; it therefore took by its purchase from Turnbow only such rights as Turnbow, its vendor, possessed, and it was not entitled to recover in this case, it being shown by the undisputed evidence that at the time Turnbow reconveyed the land, and at all times since, the obligations assumed by Turnbow were then unsatisfied, except by such reconveyance, and were of value largely in excess of the value of the land, including the minerals. Graham v. West (Tex. Civ. App.) 26 S. W. 920.

Upon the trial appellant sought to prove by W. C. Turnbow the value of the land, including the minerals, at the time he reconveyed the same to the Martin estate. Upon objection to the testimony upon the grounds that the witness had not shown himself qualified to give such testimony, the objection was sustained. Appellant has assigned the ruling of the court as error.

■ We are of opinion that it was shown that the witness was qualified to give such testimony and that the court erred in rejecting it; but we further conclude that such error was harmless, as the testimony, if it had been admitted, would have shown that the value placed by the witness upon the property was $400,000, while the undisputed evidence shows that at such time the unpaid obligations assumed by Turnbow as a consideration for the property, including taxes due thereon, amounted in value to more than $500,000. Therefore, since the testimony was offered for the purpose of showing a substantial equity in favor of appellant in the land, appellant has not been hurt.

■ The fact that Turnbow received $10,000 from the Turnbow Oil Corporation and that he used the same to take up indebtedness he had assumed as a consideration for the land would not, as contended by appellant, create an equity in favor of the corporation, which had purchased seven-eighths of the minerals from Turnbow with knowledge of the lien of Turnbow's vendors upon the land and minerals, even had the money so used been funds owned by the corporation and loaned to Turnbow; but there was no evidence showing that such money belonged to the corporation, but, to the contrary, the testimony of Turnbow tends to show that he received the same as a creditor of the corporation.

Turnbow testified that he had been advancing money to the corporation in sums from $1,000 to $4,000 at a time, and that at the time he ceased to be connected with the corporation it owed him quite a bit of money. He testified that it was his best recollection that the $10,000 was received by him after he had advanced the money mentioned to the corporation.

We think the judgment should be affirmed for the reasons already stated, but for another reason not hereinbefore stated, the writer thinks appellant is not entitled to a recovery in this suit.

■ The undisputed evidence shows, and the court found, that at the time Turnbow re-

conveyed the land in payment of the obligations assumed by him in payment therefor, he was president of the Turnbow Oil Corporation and the designated agent for such corporation in the state of Texas, with his office in Houston, Tex., and that J. E. Price was the general counsel for such corporation with his office in the city of Houston; that both of said parties knew that the executor of the estate of Martin was threatening to have the land sold to pay the purchase money and to satisfy other obligations assumed by Turnbow; that neither Turnbow nor the corporation was able to pay such money and obligations; that having such knowledge, Turnbow, with the acquiescence of Price, as a last resort reconveyed the entire property to said estate. That Turnbow, under such circumstances, was in no position to prevent a sale of the entire property for the purpose of paying his obligations, and that he could not successfully assert an equity in the property, is unquestioned. Had he considered the property of greater value than the amount of his obligations and desired to prevent the sale, he could only do so by tendering payment of his entire obligations. In such circumstances, he would not be entitled to have any part of the property set aside to him as an equity—though it be shown that other parts of the property could be sold for a sufficient sum to pay his obligations. In the opinion of the writer, the Turnbow Oil Corporation, the subvendee, with the knowledge mentioned, had no better rights in the premises than did its vendor, W. C. Turnbow. The vendor in an executory contract, such as the one being considered by us, has superior right to the entire land conveyed until the purchase money is paid. A vendee cannot make his own default a ground of rescission, nor be entitled thereby to compensation for part performance, or for recovery of such portion of the purchase money as he had advanced, nor can his vendee, who at the time he purchased had full information of the circumstances surrounding the transaction existing between the original vendor and his vendor, acquire an equity in the land without fault upon the part of the original vendee. Such subvendee is not an innocent purchaser for value without notice, and therefore he can take only such rights as his vendor possessed, and he is not entitled to any independent equity without payment of the purchase money. A subvendee asserting an equity in the land under the circumstances shown cannot force the original vendor, who is without fault, to take back a part of the land sold in payment for the purchase money. Such vendor is entitled to the payment of all the purchase money, or to the whole of the land.

There was no intimation by any witness that the land could have been sold at public sale under the terms of the deed of trust given to secure payment of Turnbow's obliga-tions, or under a foreclosure judgment, for a sum equal to or in excess of the purchase price obligations of Turnbow, or that the value of the entire property was equal to or exceeded such purchase price obligations; but, to the contrary, the undisputed evidence shows that the property did not exceed in value the sum of $400,000, which sum was much less than the sum owing by Turnbow. as purchase obligations.

Under such circumstances, it is hardly conceivable that it can be reasonably thought that Turnbow Oil Corporation had an equity in the property.

The judgment is affirmed.

Affirmed.